[No. 8281.]

## Groves et al. v. Chase.

1. Vendor and Vendee—*Fraudulent Representations of Vendor—Vendee's Inspection of Premises.* Vendee who, in making the purchase, relies upon his own examination of the premises, will not be heard to say that he was mislead by false representations of the vendor. But this rule does not apply where the buyer's examination is, by the fraudulent procurement of the seller, made under such circumstances that no fair judgment of the character and value of the premises is possible, and the buyer in fact relies on the seller's representation. (160, 162.)

The evidence examined and held to show fraudulent misrepresentations of the seller, relied on by the buyer. (158, 159.)

2. Fraud—*Representations of Value,* made with intent that they shall be relied upon, are treated as representations, not of mere opinion, but of fact. (162.)

3. EQUITY—*Laches.* Action to rescind a contract for the exchange of lands on the ground of fraudulent representations by the vendor. The contract was entered into in December, and the conveyances passed in the following March. The vendee resided at a distance from the land, and the fraud was not discovered until the succeeding August.

The action was instituted early in the next February. *Held* that plaintiff was not chargeable with such delay as should preclude a recovery. (163, 164.)

*Error to Denver District Court.* Hon. HUBERT L. SHATTUCK, Judge.

Mr. JOHH T. BOTTOM and Mr. MILNOR E. GLEAVES, for plaintiff in error.

Mr. JOHN H. GABRIEL, for defendant in error.

Mr. JUSTICE SCOTT delivered the opinion of the court.

This is an action to rescind an executed contract between the parties, for the exchange of real estate. The cause was tried to the court without a jury and judgment rendered upon the following findings of fact:

"That plaintiff was on November 29, 1910, the owner of that certain property described as lots thirty-nine (39), forty (40), forty-one (41), forty-two (42), forty-three (43), forty-four (44), forty-five (45), forty-six (46), forty-seven (47), forty-eight (48), block four (4), West Colfax subdivision in the City and County of Denver, Colorado, upon which there was constructed a fourteen room stone residence, and that defendant, Mary Alberta Groves was the owner of that certain land located in Platt County, State of Nebraska, described as the southeast quarter (S. E. ¼) of the southeast quarter (S. E. ¼) of Sec. twenty-two (22), the southwest quarter (S. W. ¼) of Sec. twenty-three (23), and the northwest quarter (N. W. ¼) of Sec. twenty-six (26), township 17, range 2 west, consisting of 360 acres with certain improvements thereon, subject to a mortgage of $2500, which said lands were by defendant A. P. Groves, husband and agent of defendant Mary Alberta Groves, represented and stated to be good corn lands, and worth $100

per acre; that plaintiff relying upon the representations and statements made concerning the said lands did on December 16, 1910, enter into a written contract with defendant Mary Alberta Groves, for the sale and exchange of said house and lots to said defendant at an agreed valuation of $24,000, and to receive the said Platte County lands at a valuation of $36,-000 and to pay to defendant in addition to the deed for the said house and lots $3,000 cash in hand, assume the incumbrance of $2,500 upon said Platte County lands, and to execute three notes aggregating $6,500 and to secure the same by a second mortgage upon said lands, and plaintiff still relying upon the representations and statements made concerning the said lands did on, to-wit, the 7th day of March, 1911, make, execute and deliver to defendant Mary Alberta Groves a warranty deed for said described lots and lands in the City of Denver, and did receive from the defendants a warranty deed for the said lands in Platte county, Nebraska, the plaintiff did pay to the defendants the sum of $3,000 cash and did assume the mortgage upon said Platte County lands in the sum of $2,500, and did make, execute and deliver to defendant Mary Alberta Groves three promissory notes aggregating the sum of $6,500 and did deliver a second mortgage upon the said Platte County, Nebraska lands to secure the same and that said deeds were made in pursuance of said representations and statements that the said lands in Platte county, Nebraska, were good corn lands of the value of $100 per acre; and the court further finds that the said lands are not good corn lands and are not of the value of $100 per acre and that the statements and representations made by defendants that the said lands are good corn lands and of the value of $100 per acre were and are false and untrue and were made with the purpose and intent of deceiving and misleading plaintiff and were relied upon and acted upon by plaintiff, believing them to be true, and that the parties hereto may be placed in the same situation in which they were placed prior to the execution

and delivery of the said contract, and the said deeds for the said lands and the payments of the said money; and the court does further find that the right and equity in this case is with the plaintiff and that the said deeds and conveyances and the said mortgage should be canceled, set aside and for naught held, and the defendants should pay to plaintiff all moneys heretofore paid by him for the said conveyance."

It is contended that this finding of fact is not supported by the evidence and that even though the evidence were sufficient to justify the finding, the circumstances of the case preclude recovery under the law.

A. P. Groves and his wife, Alberta, resided at Columbus, in eastern Nebraska. A contract to purchase the farm lands from the then owner was obtained in the name of Mrs. Groves, in November, 1910. A. P. Groves, claiming to act as the agent of his wife came to Denver during that month, with a proposition to trade the lands for Denver residence property. He proceeded to the office of William DeMude, a real estate dealer, and presented the matter to him. One Gilliland was in the office at the time, and DeMude said that he had heard that Chase had the kind of residence property that Groves wanted, and that he might trade it for land. Chase had not listed his property with DeMude or Gilliland for sale or trade.

Gilliland and Groves afterward looked at the house from the outside, and Gilliland told DeMude that Groves was willing to take the house at $20,000 if Chase would take the land at $100 per acre. DeMude presented the matter to Chase who at first declined to consider the proposition, but later suggested that he might look at the land.

Groves returned to his home and through letters from Groves to DeMude, Chase was induced to go with DeMude to look at the land in December, 1910.

At that time, the land and the country in that vicinity, was covered with about six inches of snow and it was quite cold, so that an examination of the soil could not reasonably

be made.  It appears that the land is about nine miles from
the town of Columbus, and that Groves drove Chase and
DeMude to the farm.  On the way out, Groves pointed out
farms which he assured Chase were worth $75.00 to $125.00
per acre.  DeMude testifies that after the return to town he
explained to Groves that it was fortunate that Chase did
not happen to see the gopher holes on the land, as these
would have given him an idea of the character of the soil.
DeMude also says that Groves told him in a private con-
versation that Mrs. Groves was playing her part well in
the deal.

It appears also that a tenant was at the time shelling
corn at the farm, who told Chase that the corn yielded
twenty bushels to the acre, but it appears that the Groves
explained this by saying that it was because of a poor tenant ·
who planted the corn too late.  But one hundred and twenty
acres of land was cultivated and the remainder said to be in
pasture and meadow, and the plaintiff says that Groves
assured him that the uncultivated portion was the better
corn land.  The land planted to corn appears to have been
of very small acreage.

Upon return to town, DeMude says he called on the
banker to ask as to the value of lands, but confesses that he
confined his question to the value of lands in that vicinity
and asked nothing about the particular lands involved,
though he gave Chase to understand that the answer cor-
roborated Groves' statement.  Chase testifies that Mrs.
Groves told him that she inherited the lands, when in fact
she had then secured the contract of purchase only.

The whole testimony would seem sufficient to justify
the court in finding that instead of a fair and open inspection
of the lands, Groves, Mrs. Groves and DeMude, by conniv-
ing and mis-representation if not by actual conspiracy, pre-
vented such fair examination and inspection.  The employ-
ing of DeMude by Groves, the arrangement for inspection
at the particular time when the ground was covered with

snow, so as to make satisfactory investigation difficult, if not impossible; the fact that DeMude, who was dealing for Groves, but representing himself as friendly to Chase, should find it necessary to go with Chase to make the examination; the apparently deceptive conduct of both the Groves and DeMude, and the clearly false representations as to the value of the lands and the character of the soil, smack of a fraud intended to be practiced on Chase to prevent the very thing contemplated by the law by inspection and investigation.

The contention of the plaintiff in error is that Chase by making such inspection is barred by the doctrine of *caveat emptor*, and counsel cite the rule in *Farrar v. Churchill*, 135 U. S. 609, 34 L. Ed. 246, 10 Sup. Ct. 771, as follows:

"If a purchaser of real estate, to whom representations of the character and value of the property are made by the vendor, visits the property itself prior to the sale, and makes a personal examination of it touching those representations, he will be presumed to rely upon his own examinations, in making the purchase, and not upon the representations of the vendor, and in the absence of fraud or concealment, cannot have the sale set aside."

In this case it is evident that there was fraud and concealment and for such reason the rule cannot apply.

*Farnsworth v. Duffner*, 142 U. S. 43, 35 L. Ed. 931, 12 Sup. Ct. 164, is also cited wherein it is ruled that "Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's representations."

Again, *Poland v. Brownell*, 131 Mass. 138, 41 Am. Rep. 215, is also cited wherein it is said:

"For all that appears, both buyer and seller had equal means of information and were equally well qualified to

judge of the value of the property. The evidence shows that the plaintiff relied upon his own examination and the advice of his friend. But what is more decisive, the statements in relation to the goods which were made by the defendant must be deemed to be mere seller's statements, and furnish no ground for an action for damages."

These cases may be said to well state the law, but in the case at bar the buyer and seller for the reasons stated, did not have equal means of information, and it is quite plain that Chase relied upon the false representations of Groves and his wife as to conditions, which for physical reasons were not to be reasonably ascertained by an examination of the premises at the time. The doctrine is well stated in *Wier v. Johns,* 14 Colo. 493, 24 Pac. 262, to be:

" 'Whatever is notice enough to excite attention, and put the party upon his guard, and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it.' In Ang. Lim., Sec. 187, and notes: 'The presumption is that, if the party affected by any fraudulent transaction or management might, with ordinary care and attention, have reasonably detected it, he reasonably had actual knowledge of it.' In *Wood v. Carpenter,* 100 U. S. 143, (25 L. Ed. 807,) after a careful examination of the authorities, it is said: 'Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry.' "

The representations made by the Groves in this case were material, viz.: That the land was good corn land and that it was of the value of one hundred dollars per acre. They were in a position to know, and evidently did know, of the falsity of these statements.

Chase was not in position to know, did not know, and apparently relied on such representations.

In *Linington v. Strong,* 107 Ill. 295, the court says:

"While the law does require of all parties the exercise of reasonable prudence in the business of life, and does not permit one to rest indifferent in reliance upon the interested representation of an adverse party, still, as before suggested, there is a certain limitation to this rule, and as between the original parties to the transaction we consider that where it appears that one party has been guilty of an intentional and deliberate fraud, by which, to his knowledge, the other party has been misled, or influenced in his action, he cannot escape the legal consequences of his fraudulent conduct by saying that the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care."

In *Hetland v. Bilstad,* 140 Ia. 411, 118 N. W. 422, the court said:

"Parties in negotiating deals have the right to exalt the value or quality of their own property to the highest point credulity will bear, provided their efforts in this line go no further than puffing or praise which the vendor may properly indulge in; but statements of value or of quality may be made with the purpose of having them accepted as of fact, and, if this is done and so relied on, they are to be treated as the parties designed they should be, namely, representations of fact. *Mattauch v. Walsh,* 136 Ia. 225, 113 N. W. 818. In that case the court said: 'The evidence in behalf of plaintiff clearly indicated the intention of Walsh that his assertion of the value of the land should be acted upon as true, and not merely as his estimate, and, if so, and it was knowingly false and induced an exchange by plaintiff to her damage, it was actionable.' "

It appears that the Nebraska lands were in the river bottom and near the river. There was testimony to show that because of the sandy character of the soil, the pasture lands grew weeds chiefly, and that the grass was in tufts and spots, and that the soil was of such sandy character

that it was largely drifted by the winds, and not well suited to the growing of crops.

Samples of the soil, said to be representative of substantially all of the tract, were exhibited to the court upon the trial, and the testimony is such as to warrant the court in finding that the actual value of the land was in no considerable proportion to that represented, and that it was not in a reasonable sense corn producing land.

It is urged that the plaintiff below misrepresented the value of his dwelling and premises so exchanged, and therefore, being equally in the wrong, cannot recover.

Chase admitted that he told Groves that the dwelling cost $22,000 to build and that each of the ten lots cost the builder $600.00. But there is no testimony to indicate that this was not the exact truth.

True he further admitted that he paid only $9,500 for the property and that he had offered it for sale for $15,000 and for $18,000. But it does not appear that he made any other representations as to value than the cost of construction of the building, and of the lots upon which it was placed. Groves fully inspected the building and the premises. How this could be a misrepresentation of the present or market value of the premises is not clear.

Lastly, it is contended that the plaintiff was guilty of laches in bringing this action and for such reason it may not be maintained.

The contract was entered into on the 16th day of December, 1910, and the deal closed in March, 1911. This suit was instituted February 3, 1912.

It appears that the farm was rented at the time of the exchange. Chase, who resided in Denver, did not for such reason see the land after the execution of the contract until August, 1911, when he discovered the fraud.

Under the circumstances of this case we do not think there was such unreasonable or negligent delay as will pre-

clude recovery.   The rule in this respect was stated in *Sears v. Hicklen,* 13 Colo. 143, 21 Pac. 1022, to be:

"What is reasonable diligence is not and cannot be defined by any general rule.   No precise or definite limit of time can be stated within which the interposition of the court must be sought.   What is reasonable time must in a great measure depend upon the exercise of the sound discretion of the court, under the circumstances of each particular case.   *Hawley v. Cramer,* 4 Cow. 717; *Hallet v. Collins,* 10 How. 174, (13 L. Ed. 376).   On examining the authorities, no like case is found where relief was refused, unless a much greater time had elapsed.   The time in which the courts have treated demands as stale, varies from four to twenty years, depending upon the character of the case.   We are not definitely informed when plaintiff first had knowledge of the fraud, but if known immediately after the conveyance, when the situation and circumstances of plaintiff are considered, we think the court was warranted in finding that there had not been such unreasonable and negligent delay as to bar her right to relief."

The testimony in this case is very conflicting, but the trial judge had the witnesses before him and was charged with the responsibility of passing upon their credibility and the weight of the evidence.

From a careful consideration of all the evidence before us we are of the opinion that there was sufficient evidence to warrant the findings and decree of the court, and under the uniform holding of this court, that such findings will not be disturbed unless palpable wrong appears, the findings and decree in this case will not be disturbed.

The judgment is affirmed.

GABBERT, C. J., and TELLER, J., concur.

Decided July 12, A. D. 1915.   Rehearing denied October 4, A. D. 1915.