No. 17,560.

PAT CHERRINGTON, ET AL. *v.* CARL E. WOODS.

(290 P. [2d] 226)

Decided November 21, 1955.   Rehearing denied December 12, 1955.

Mr. KARL R. AHLBORN, Mr. ROBERT L. McDOUGAL, for plaintiffs in error.

Messrs. HOUTCHENS & HOUTCHENS, Mr. PAUL E. GARRISON, for defendant in error.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the Court.

ON September 24, 1952, plaintiffs in error, the Cherringtons, were the owners of the fixtures and stock in trade they were using in connection with a business known as "Pat's Liquor" in Evans, Colorado. Shortly before they had engaged one Brasier to sell the premises, which he advertised. It is claimed that it was represented to Woods, defendant in error, that the business was earning a net profit of $1400 to $1600 a month, and that the margin of profit in the business was 28½%. Woods entered into an agreement to purchase the property and made a down payment of $12,500. The sales agreement provided that the purchaser pay $33,024.39 for the property, $12,500 in cash and $400 per month, and that the inventory of $13,024.29 would be maintained and in case of failure of make the payments con-

tract would be forfeited upon the seller giving the buyer 60-days notice. The buyer, after full opportunity, as provided in the contract, to inspect the premises and the books of the business for about one week, entered into possession and operated the business and admittedly had a net earning of $7000 in a little over one year.

On November 9, 1953, Woods filed the complaint herein for damages against the Cherringtons and E. L. Brasier, alleging misrepresentation as to the amount of the net profit per month and that they believed the representations that had been made to them, but that the representations were false and known to be so at the time they were made; that if the representations had been true the business would have had a reasonable market value of $75,000, when in truth and in fact it had a value of approximately $15,000, and therefore claimed damages for the difference in the sum of $60,000.

Brasier answered admitting that the property had been listed with him; denied all other allegations of the complaint; and stated that the actual transaction was closed between the parties thereto not in his presence and that he took no part in the closing of the deal. The Cherringtons answered, denying that Ruth Cherrington was the owner of any interest in the property; admitted that Brasier was employed to find a buyer; denied any misrepresentation; and filed a counterclaim alleging that the buyer, Woods, gave them a promissory note on which there was a balance due of $18,638.07, with interest of $1692.96 and ten per cent attorney's fees, or a total of $22,364.15; that Woods, the buyer, entered into a written agreement and failed to make the payments provided therein; failed to maintain a stock of inventory at the fixed figure of $13,024.29; also failed to insure the property; and that by reason thereof the property is deteriorating in value. They also asked for a receiver, which was denied. The contract of sale and copies of the note were before the court on a trial held June 8, 1954, at

which time the court entered judgment for $22,364.15 in favor of the Cherringtons and denied a receiver.

. The trial court in entering the judgment stated that Woods, plaintiff, had a full and complete opportunity to make an investigation, and that he affirmed the agreement and thereby waived any fraud. The motion for new trial was filed and granted on June 28, 1954, and the court vacated the judgment. The Cherringtons had moved for a restraining order alleging that the notice of forfeiture had been served on Woods, who had breached the terms of the agreement and failed to maintain the stock; and that Woods admitted that he had depleted the stock to $9000, and had not insured the property. At the second trial, begun on August 19, 1954, the court permitted plaintiff to reopen the case *only* for the purpose of taking additional testimony. Woods moved to amend his complaint to conform to the proof by adding "including inventory" after the figure of $15,000 in the complaint, which was granted. The court found the allegations of the complaint had been sustained and ordered the contract and note to be returned to the court for cancellation and plaintiff have judgment against defendants on defendants' counterclaim, and dispensed with a new trial.

Woods, after 'a brief inspection of the property on September 18, 1952, gave a check for $500 to the National Investment Company and received a receipt and contract therefor setting out the terms of the sale and containing the following provision, "* * * It is understood that the books and records of said business will be open and available for Mr. Woods' inspection and said present owner will agree to assist and introduce Mr. Woods to his customers for ten days * * *." Immediately thereafter Woods and his wife, whom he said was his bookkeeper and familiar with such matters, since he had operated a tavern in Wyoming for six or seven years, also in Garden City, Kansas, and a tourist court in Hutchinson, Kansas for seven and one-half years, went

to the place of business in Evans, obtained quarters nearby, and spent virtually all of the time thereafter operating the place. They were furnished all of the books that were kept in connection therewith, together with a beverage analyst, which gave the wholesale price and the retail selling price. There is no contention by plaintiff that the books were not regular and correct. Mrs. Woods spent several hours on several different days examining the invoices and the book showing the sales over a long period of time, and after full and unrestricted opportunity for inspection of the premises, the books and stock in connection therewith and operating the business during the period between September 18 and September 24, the final agreement for sale and purchase of the premises was entered into.

The entire matter was tersely summated by the trial court in its statement at the time of dismissing the case at the end of the first trial, wherein the court pointed out that "Woods was in and out of the store during approximately one week and was there on many occasions and had a full and complete opportunity to make every examination to ascertain every fact he might have wanted to know. He could have determined everything necessary, or any facts necessary connected with the business during that time had he done so." The court further found and determined that "The evidence indicates that the plaintiff did not act entirely upon the representations of Brasier or Pat Cherrington but also upon his own judgment. During the week he was in and about the store and he had every opportunity to make every and any investigation that he wanted." The court made the further finding that by retaining possession of and operating the business, by making payments on the note for a period of six months, by attempting to negotiate a reduction in the balance of the purchase price due on the business about ten months after its purchase, and by making no complaint of fraudulent representations until more than a year after the purchase of the

business, plaintiff had waived the alleged false representations; that if any fraud existed, it was condoned.

The record does not reflect any reason why the trial court, without making separate and different findings, entered a contrary judgment on the second trial. The only additional testimony offered on the second trial by plaintiff was in calling back the real-estate operator for further examination as to the value of such a business. And it is interesting to note in that connection that the witness admitted that he had had no opinion as to the value of "Pat's Liquor Store" on September 20, 1952, at the time the transaction was being closed. It is thus seen that there was nothing whatever in the second trial to alter the findings or the court's opinion as reflected in the judgment entered at the close of the first trial. The inconsistencies which prevailed in this litigation are numerous and will not be discussed. An illustration is in the court's finding that there was no wrongdoing on the part of Ruth Cherrington, still it canceled the note, one-half of which was owned by her, an innocent party.

█ The allegations of fraud and misrepresentations are, in effect, annihilated by the provision in the first contract of September 18 that "It is understood that the books and records of said business will be open and available for Mr. Woods' inspection * * *," and the dealings predicated upon such contract must be said to have been without fraud, and there is absolutely no proof of fraud in the record. The entire record is replete with evidence that plaintiff and his wife, as experienced business people, made a lengthy and complete inspection and examination of all matters concerning the business and that plaintiff relied upon this separate and independent investigation. He does not deny that he knew the contract contained the provision that, "Any representations made not mentioned in this contract shall not be binding upon anyone." The entire record is convincing in support of the trial court's first finding and there is no evidence

to support any judgment for damages as finally determined by the court.

■■ Without further discussion we determine that this case should be reversed, the reversal being predicated upon clear and distinct rulings of this court in former cases which we think are conclusive, namely, *Groves v. Chase,* 60 Colo. 155, 151 Pac. 913; *Emerson-Brantingham Implement Co. v. Wood,* 63 Colo. 1-30, 165 Pac. 263; and *Bosick v. Youngblood,* 95 Colo. 532, 37 P. (2d) 1095.

"Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's representations.

\* \* \*

"Whatever is notice enough to excite attention, and put the party upon his guard, and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it. 'The presumption is that, if the party affected by any fraudulent transaction ·or management might, with ordinary care and attention, have reasonably detected it, he reasonably had actual knowledge of it.' \* \* \* 'Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry.' " *Groves v. Chase, supra.*

For the reasons herein indicated the judgment is reversed and the cause remanded with directions to the trial court to dismiss the complaint and for further proceedings on the counterclaim.